**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AVANTGARDE SENIOR LIVING D/B/A AVANTGARDE SENIOR LIVING OF TARZANA, and JASON ADELMAN, individually and on behalf of all of those similarly situated,<br><br>                                    Plaintiffs,<br><br>v.<br><br>GOFUND, LLC D/B/A PENN CAPITAL FUNDING; MAPCAP FUNDING, LLC; MIRIAM DEUTSCH; MOSHE KATZ; AND JOSEF BREZEL,<br><br>                                    Defendants. | Docket No.: |

## CLASS ACTION COMPLAINT

Plaintiffs AvantGarde Senior Living and Jason Adelman (collectively, "Plaintiffs"), by their attorneys, White and Williams LLP, as and for their Class Action Complaint, individually and on behalf of all of those similarly situated, against Defendants Bridge Funding Cap, LLC d/b/a Penn Capital Funding, MapCap Funding LLC, Miriam Deutsch, Moshe Katz and Josef Brezel (collectively, "Defendants") allege:

## NATURE OF THE ACTION

1.     This is a class action against several related merchant cash advance ("MCA") companies that are controlled and manipulated by Defendants Deutsch, Katz and Brezel to carry out a fraudulent scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs and hundreds of other similarly situated victims.

2.     In November 2018, Bloomberg News and renowned journalist Bethany McLean (of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news

articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize out-of-state bank accounts.[1]

3.     The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019.  In support, the Legislature cited Bloomberg News.

4.     More recently, on February 10, 2022, Bloomberg News exposed a new tactic being abused by the predatory MCA industry, and in particular, Defendants here.  *See* Ex. 1.

5.     Specifically, Defendants operate out of New York but abuse an apparent loophole under Connecticut procedural law to collect upon their unlawful debts.  In doing so, Defendants freeze out-of-state bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut.  As justification for their bank freezes, Defendants represent and attest under oath that their small business victims owe them a debt and that Defendants are unaware of any defenses to their claims.

6.     According to Bloomberg News, this Connecticut loophole was used more than 180 times just last year.  The result of this tactic is often catastrophic because Defendants can freeze out-of-state bank accounts without any notice whatsoever.  Once frozen, Defendants can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

7.     This tactic is especially harsh because even when the small business victim capitulates to Defendant's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

---

[1] *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html* ; *https://www.bloomberg.com/confessions-of-judgment*

8.      As further reported by Bloomberg News, Defendants operate a series of related predatory lending companies under various fictitious names.

9.      Defendants purportedly act under the direction of or in concert with a former drug trafficker, John Braun, who recently had his federal prison sentence commuted by President Trump without utilizing the safeguards and review process typically employed by U.S. Presidents. *See* Ex. 1.

10.     Here, in addition to collecting unlawful interest, Defendants engaged in another typical tactic employed by MCAs, over collecting and then "ghosting" the merchant.  This tactic has recently drawn intense scrutiny by the New York Attorney General and the Federal Trade Commission, filing suit against numerous MCA companies engaged in this over-collection scheme.  Among these MCA companies accused of these unlawful tactics are companies owned and operated by Braun.  *See* Exs. 2-3.  As reported by Bloomberg News, Defendants have conspired with Braun to further these unlawful activities.

11.     The over-collection here is as clear as is gets.  The amount Defendants were permitted to collect on the face of the MCA agreement at issue was $625,000.  Defendants nevertheless brazenly and unlawfully collected $729,118, and were never to be heard from again, despite repeated requests to refund the over-collection.

12.     Regrettably, Plaintiffs are not alone, and thus, bring this action on behalf of Plaintiffs and those similarly situated, to permanently enjoin Defendants from their myriad unlawful practices.

## THE PARTIES

13.     Plaintiff AvantGarde Senior Living d/b/a AvantGarde Senior Living of Tarzana ("AvantGarde") is a California corporation with its principal place of business located in Tarzana, California.

14.     Plaintiff Jason Adelman ("Adelman") is an adult resident and citizen of California.

15.     Defendant Penn Funding LLC is limited liability company operated by Defendants Deutsch, Katz and Brezel.  The address listed on its corporate filing lists 1274 49th Street, STE 455, Brooklyn, New York 11219 as its sole address.

16.     Defendant MapCap Funding, LLC is limited liability company operated by Defendants Deutsch, Katz and Brezel.  The address listed on its corporate filing lists 1449 37th Street, STE 213, Brooklyn, New York 11218 as its sole address.

17.     Defendant Yosef Brezel is an individual and citizen of New York.

18.     Defendant Miriam Deutsch is an individual and citizen of New York.

19.     Defendant Moshe Katz is an individual and citizen of New York.

## JURISDICTION

20.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant is a resident and citizen of New York.

21.     Each Defendant is further subject to the personal jurisdiction of this Court because each regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii)

the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

23.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U. S. C. §§ 1961–68 ("RICO").

24.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

25.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

26.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

27.     Venue is proper because each Defendant regularly conducts business within this judicial district.

**COMMON FACTUAL ALLEGATIONS**

A.     **The Predatory MCA Industry.**

28.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[2] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

---

[2] https://www.sec.gov/litigation/admin/2008/34-58574.pdf

29.    As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3]  The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."  *Id.*

**B.    The Sham.**

30.    Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."  MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.  The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

**C.    The Bloomberg Awakening.**

31.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean

---

[3] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[4]

32.     As a direct result of the light shone on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

33.     Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story."  As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.

34.     Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[5]

35.     On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[6] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[7]

36.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[8] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of

---

[4] *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html*

[5] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

[6] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

[7] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html

[8] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small

dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

37.    On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[9]

38.    On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[10]

39.    On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[11]

40.    As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[12]

**D.    The Sea Change in Law.**

41.    Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA

---

[9] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf.
[10] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[11] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[12] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167, Aug. 11, 2020.

companies.  Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion.  One court went so far as to sanction the attorney for even bringing the motion.  *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

42.     The tide has since turned in the wake of the Bloomberg articles.  Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims.  Numerous courts have followed suit.  *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *Matter of AH Wines Inc., v. C6 Capital Funding LLC*, 2020 N.Y. Misc. LEXIS 4642 (N.Y. Sup. Ct. Ont. Cty. Aug. 19, 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019).

43.     Numerous federal courts have also joined the revolution. *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) (upholding

RICO claims under MCA agreement); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

44.     So has New York's highest court.  Most notably, a member of New York's highest court, just recently advised in *dicta* that MCA transactions, like here, more closely resemble loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

**E.     The MCA Agreements are Substantively And Procedurally Unconscionable.**

45.     The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length.

46.     Instead, the MCA Agreements contain one-sided terms that prey upon the

desperation of the small business and their individual owners and help conceal the fact that

each of the transactions, including those involving the Plaintiffs, are really loans.

47.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving

the MCA company the irrevocable right to withdraw money directly from the merchant's bank

accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision

preventing the merchant from transferring, (3) moving or selling the business or any assets without

permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the

merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue

and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the

laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of

default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement

providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing

from other sources, (11) the maintenance of business interruption insurance, (12) an assignment

of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit

card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations

due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file

any claims or taken any action or institute any proceeding…"

48.     The MCA Agreements are also unconscionable because they contain numerous

knowingly false statements. Among these knowingly false statements are that: (1) the transaction

is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the

fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is

labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

49.     The MCA Agreements are also unconscionable because they are designed to fail.

Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

50.     The MCA Agreements also contain numerous improper penalties that violate

New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) entitle the MCA company to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just two fixed daily payments.

### N.     The Enterprise Intentionally Disguised the True Nature of the Transaction.

51.     Despite the documented form, the Transaction is, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to

collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)      The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)      The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)      The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)      The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)      The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## FACTS SPECIFIC TO PLAINTIFFS

### A.      AvantGarde Senior Living.

52.      AvantGarde Senior Living is an assisted living and memory care facility located in Tarzana, California.  It is owned and operated by Adelman.

53.      AvantGarde has over one-hundred residents and employs over one-hundred employees.  The average payroll is in excess of $240,000 per month which includes both 401k

contribution as well as an established group health plan for our staff and a very generous PTO since they are frontline workers and they deserve it.

54.     As a direct result of the Covid-19 pandemic, AvantGarde funds were greatly reduced due to the choice AvantGarde took for the safety of its residents and staff (not a requirement but our obligation) to pay for testing, personal protection equipment, cleaning supplies, overtime, hazard pay, quarantine pay, as well as other necessary expenses to protect the residents and employees.

55.     In 2020, AvantGarde went from approximately 115 residents to 105, which resulted in a decline in revenues of approximately $60,000 per month, along with an almost non-recourse collection of receivables (bad debt was never an issue pre pandemic), causing our A/R to increase substantially during the 2020 year.

56.     In other words, expenses went up, and revenues went down. To make matters worse for the ownership, AvantGarde's aging receivables escalated to obscene levels due to both its understanding of its resident's guarantor's adverse effects of the pandemic but various city, state and federal landlord mandates it had to adhere by.

57.     Prior to Covid-19, the margins at Avantgarde were less than 10%.  As a direct result of Covid-19, the margins turned negative and Avantgarde has operated at a loss during the entire period of the pandemic. Since the purchase of the facility in 2010, Adelman has taken little if no salary and has willingly given back all of his wages for the benefit of his staff and residents.

58.     In late fall of 2020, due to the fortunate circumstances of owning a 165 bed, sub-acute hospital, which gave Adelman a tenure of viral, bacterial and pandemic knowledge above and beyond what the typical owner of an RCFE would know, Adelman proactively purchased HVAC and portable  anti- viral lanterns UV light,  along with other equipment to comply with

CDC guidelines and to protect the residents and employees.  The cost of that equipment was in excess of $400,000.  As a direct result, Avantgarde was actively looking for long-term financing of approximately $1,000,000 over as long of a period possible so it could be proactive in this deadly pandemic, which comes and always will come first.

**B.     The Never-Ending Spiral of MCA Debt.**

59.     Desperate for cash to protect its staff and residents from the COVID-19 pandemic, Avantgarde turned to the MCA world as a short-term solution to its cash needs.

60.     Due to the unlawful and unconscionable interest rates charged by the MCA companies, Avantgarde was trapped in a never-ending spiral of debt, effectively being forced to enter into a series of MCA loans to pay off each of the prior ones.

61.     As described in the FTC and NY AG complaints against Braun and his various companies, MCA companies often use fictitious names so that the borrower does not know the true identity of MCA lender.

62.     Here, Avantgarde was passed around by Defendants from one of their MCA companies to the next.

63.     The particular MCA agreement at issue here was entered into on July 23, 2020.

64.     The MCA provided Plaintiffs an advance of $500,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $625,000 (the "Purchased Amount") was repaid.

65.     The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $6,994 (a "Daily Payment"), and the amount would be repaid in just 90 business days which, on its face, translates to an annual interest rate of more than 100% per annum or more than 4 times the maximum 25% rate permitted under New York Penal Law.

66.     The fixed daily payment was disguised as a good-faith estimate equal to 10% of Avantgarde's daily revenues.  The estimated daily payment did not remotely reflect 10% of Avantgarde's daily revenues.  Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

67.     A review of Avantgarde's bank statements provided to Defendants prior to funding reveals that the estimated good-faith payment was a sham, and not based on any good-faith estimate of actual receivables.

68.     Even worse, Defendants did not advance Plaintiff the full Purchased Amount. Instead, Defendants advanced only $480,000 after deducting so called fees, which were nothing more than further disguised interest in consideration for making the loan.

69.     In addition to shorting Avantgarde on the money advanced, Defendants demanded at least two separate wire payments in the amount of $20,982 on August 5, 2020 and $20,832 on November 25, 2020.

70.     In total, Defendants advanced $480,000 and Plaintiffs repaid $729,118 in the span of just four months.  That is in interest rate in excess of 150%.

## CLASS ALLEGATIONS

71.     Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

72.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

73.     Plaintiffs bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> All persons in the United States who, on or after February 25, 2018 paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

74. **Numerosity**:  The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the thousands.

75. **Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class but are not limited to the following:

   a) Whether the MCA Agreements are loans;

   b) Whether the MCA Agreements are usurious;

   c) Whether the MCA Agreements are void;

   d) Whether Plaintiffs and the Classes may recover any moneys or property paid to the Enterprise pursuant to the MCA agreements; ; and

   e) Whether Defendants' conduct was willful or knowing.

76.   **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

77.   **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes

78.   **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

79.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.     The Unlawful Activity.**

80.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

81.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

82.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

83.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

84.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

85.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

86.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

87.     Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

88.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

89.     Brezel, Deutsch and Katz are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

90.     Brezel, Deutsch and Katz are the owners of Penn Capital and MapCap, which, collectively, have less than ten (10) employees.

**C.      The Enterprise.**

91.     Defendants Penn Capital, MapCap, and their Investors, including Brezel, Deutsch and Katz constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

92.     The Enterprise and its Investors are associated-in-fact through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

93.     Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

94.     The Enterprise and its Investors consist of the following other entities: Merchant Capital, Bridge Funding Cap, LLC, United Fund USA, Fundura Capital, Lifetime Funding, Go Fund, Funding 123 and Matrix Advance.

95.     The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under the Constitution of the State of California, Article XV, Section 1 and the California Financial Code § 22000 et seq. and N.Y. Penal Law § 190.40.

96.     Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

97.     The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**C.     The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

98.     The RICO Person has organized himself and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

i.      **Yosef Brezel.**

99.     Brezel is a principal of the Enterprise. Together with the other principals, Brezel is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

100.    In his capacity as the mastermind of the Enterprise, Brezel, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

101.    Brezel has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

102.    Brezel has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other principals and to the Investors of the deals in which he has personally participated.

ii.     **Miriam Deutsch.**

103.    Deutsch is also principal of the Enterprise. Together with the other principals, Deutsch is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

104.    In her capacity as a principal of the Enterprise, Deutsch, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

105.    Deutsch has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

106.    Deutsch has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other principals and to the Investors of the deals in which he has personally participated.

### iii.    Moishe Katz.

107.    Katz is also a principal of the Enterprise. Together with the other principals, Katz is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

108.    In his capacity as the mastermind of the Enterprise, Katz, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

109.    Katz has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

110.    Katz has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other principals and to the Investors of the deals in which he has personally participated.

### iv.   Penn Capital Funding, LLC.

111.   Penn Capital maintains officers, books, records, and bank accounts independent of the principals, and the Investors.

112.   The principals and the Investors have operated Penn Capital as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Penn Capital has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

113.   In this case, Penn Capital, through Defendants: (i) pooled funds from Investors to fund the Agreement; (ii) underwrote the Agreement; (iii) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreement by effecting wire transfers from the bank accounts of Plaintiffs.

### v.   MapCap Funding, LLC.

114.   MapCap maintains officers, books, records, and bank accounts independent of the principals, and the Investors.

115.   The principals, and the Investors have operated MapCap as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, MapCap has: (i) entered into contracts with brokers to solicit borrowers for the

Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

116.    In this case, MapCap, through Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### vi.    The Investors

117.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the principals, Penn Capital, and MapCap.

118.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Penn Capital and MapCap, with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

119.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

**E.    Interstate Commerce**

120.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

121.    Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

122.    In the present case, all communications between the members of the Enterprise, and Penn Capital and MapCap were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the payments via interstate electronic ACH debits.

123.    In addition, at the direction of Defendants, each of the Agreements was executed in states outside of New York, and original copies of the Agreements were sent from California to the Enterprise, through Defendants, at their offices in New York via electronic mail.

**F.    Injury and Causation.**

124.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

125.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments.

126.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

127.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

128.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

129.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

130.    By and through each of the Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendant and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, Defendant knew the nature of the Enterprise and Defendant knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendant knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

131.    Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was

a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

132.   Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

133.   The participation and agreement of Defendant and each Enterprise Member was necessary to allow the commission of this scheme.

134.   Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

135.   The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, lost customers, loss of goodwill, and lost profits.

136.   Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

137.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## THIRD CAUSE OF ACTION
### (Breach of Contract/Duty of Good Faith)

138.   Plaintiffs repeat and hereby incorporate each of the above allegation.

139.   Defendants each had a duty to act in good faith and to deal fairly with Plaintiffs.

140.    Defendants, without any fault on the part of Plaintiffs, failed and refused to act in good faith, with honesty and integrity to perform under their respective agreements by over collecting the amounts due thereunder and/or failing to credit Plaintiffs for payments when they "refinanced" and rolled over inflated balances into the new agreements.

141.     Defendants further breached the terms of each of the MCA Agreements by not abiding by its provisions. As a result of these actions, Defendants collected more than they were entitled to under the below agreements.

142.    By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in the amount of the over collections and uncredited payments.

## FOURTH CAUSE OF ACTION
### (Fraud)

143.    Plaintiffs repeat and re-allege each of the above allegations.

144.    The MCA Agreement contained an appendix setting forth various fees chargeable to Plaintiffs under the agreement including an "Origination Fee," a "Due Diligence Fee," and an "ACH Fee."

145.    The MCA Agreement represented that these fees were for services or costs purportedly provided by or incurred by the Enterprise MCA Companies in connection with their respective agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA Agreement and the so-called "fees" were nothing more than additional profits reaped by the Enterprise under the MCA Agreement.

146.     For example, the MCA Agreement provides for an "Origination Fee" in order "to cover Underwriting and related expenses."  However, Defendants performed little or no due diligence and conducted very little underwriting when entertaining into the MCA Agreement.

147.    Initially, Defendants required little more than the completion of an online application and three months bank statements and approved the loan in a matter of hours.

148.    Defendants also told Plaintiffs they would deduct an "ACH Program Fee" because managing Plaintiff's Daily Payments was "labor intensive and . . . not an automated process," but, in fact, the process is entirely automated and inexpensive.

149.    Defendants knew that their representations concerning the nature and purpose of the Origination Fee, ACH Program Fee and other fees were false and misleading at the time they entered into the MCA Agreement.

150.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the MCA Agreement were legitimate fees charged to offset the costs of services provided by Defendants under the MCA Agreement.

151.    Plaintiffs reasonably relied upon these representations in entering into the MCA Agreement and, ultimately paying, the fees through either the Daily Payments.

152.    By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in the amount of in the amount of fees charged to Plaintiffs by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, and seek an Order:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)    Declaring that the Agreements entered into between Class Members and Defendants constitute a loan transaction, and thus, are void because each intended to charge and receive a criminally usurious interest rate in excess of 25%;

c)      Ordering Defendants to repay all principal and interest previously paid to Defendants in connection with the criminally usurious loans, including prejudgment interest;

d)      Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

e)      Awarding the Plaintiffs and Class Members direct and consequential damages;

f)      Awarding Plaintiffs and the Class Members treble damages;

g)      Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

h)      Granting such other and further relief as this Court deems just and proper.

DATED:     New York, New York
               May 25, 2022

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
7 Times Square
New York, NY  10036
(212) 244-9500 or (215) 864-6329
heskins@whiteandwilliams.com